**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| STANLEY CAVIENSS, | |
|     *Plaintiff*, | |
|     v. | No. 3:21-cv-01694 (MPS) |
| NORWALK TRANSIT, AFSCME | |
|     *Defendant*s. | |

**RULING ON MOTIONS TO DISMISS**

## I.      INTRODUCTION

Stanley Cavienss alleges that his Tourette Syndrome causes him to inadvertently vocalize unwanted sounds, including obscenities. According to Cavienss, while he was employed as a bus driver for Norwalk Transit Authority, an altercation with a bicyclist triggered his Tourette Syndrome, leading to an "outburst" where he used obscenities. Norwalk Transit Authority then terminated Cavienss, and he claims that his union, AFSCME, failed to defend him. Cavienss, proceeding *pro se*, filed suit against Norwalk Transit Authority and AFSCME, alleging violations of the Americans with Disabilities Act ("ADA") and the National Labor Relations Act ("NLRA"). He also claims that Norwalk Transit Authority defamed him. Both defendants have moved to dismiss all claims against them. For the reasons explained below, I grant AFSCME's motion to dismiss. I grant Norwalk Transit's motion to dismiss as to the defamation claim against it and deny its motion to dismiss as to the ADA discriminatory discharge and failure to accommodate claims against it.

## II.      BACKGROUND AND PROCEDURAL HISTORY

The following facts, drawn from Cavienss' Sixth Amended Complaint and exhibits, are accepted as true for the purpose of this motion.

1

### A.  Caviens' Employment with Norwalk Transit District

Caviens has been diagnosed with Tourette Syndrome, a condition "[from] which he has suffered since childhood," and he also has severe dyslexia. ECF No. 101 ¶ 4. His Tourette Syndrome "significantly impacts his . . . communications skill[s]," necessitating special education classes in elementary school. *Id.*

Caviens has spent his career as a bus operator. *Id.* ¶¶ 6-9. On or around September 10, 2021, Caviens began working as a bus operator for Norwalk Transit Authority ("NTA"). *Id.* ¶ 11. NTA is a quasi-municipal corporation that provides transportation services for the Greater Norwalk area and Westport, Connecticut. *Id.* ¶ 5.

Prior to working for NTA, Caviens was a bus operator for Goodwill Industries of New England in New Haven, Connecticut and had another position as a bus operator for the MARTA transit system in Atlanta, Georgia. *Id.* ¶¶ 6, 13. He was "celebrated by his bus customers, especially disabled customers, for his caring and professional manner," and "he often remembered and celebrated the birthdays of regular riders." *Id.* ¶ 7.

When he applied to work for NTA, Caviens disclosed on his application that he has Tourette Syndrome and severe dyslexia. *Id.* ¶ 9. Specifically, his application mentioned that his impairments "cause[] him to sometimes involuntarily vocalize unwanted sounds or obscenities, especially in reaction to stressors." *Id.* ¶ 10. He requested accommodations in employment training and testing. *Id.* ¶ 9.

Caviens' duties for NTA included "operating passenger buses on designated routes in the Greater Norwalk area." *Id.* ¶ 12. Caviens had a special commercial driver's license, and a graduate certificate from Perimeter College, where he was trained to operate heavy duty equipment. *Id.* ¶ 13. And in his work for the MARTA transit system, he learned about dangers of the road and

professionalism. *Id*. For the first two months of his employment with NTA, Cavienss did not have any driving incidents. *Id.* ¶ 14.

On November 15, 2021, Cavienss was covering for another NTA bus driver by driving the "city bus line," which was not his normal route. *Id.* ¶ 15. On Cavienss' trip, a cyclist who was biking in front of the bus "engaged in unsafe behavior," including biking without a helmet and crossing in front of the bus without signaling. *Id.* ¶¶ 16, 18. When the cyclist stopped in front of the bus, impeding the flow of traffic, Cavienss honked at him and asked him to move his bicycle. *Id.* ¶¶ 18, 20. The cyclist responded with "vulgar language" and made an "obscene gesture" at Cavienss. *Id.* ¶ 20.

Feelings of anxiety, fear, or frustration trigger Cavienss' Tourette Syndrome, such that he "sometimes . . . involuntarily vocalize[s] obscenities." *Id.* ¶ 17. The cyclist's actions made Cavienss "extreme[ly] . . . anxious." *Id.* ¶ 16. As a result, he had a "verbal outburst," during which he "involuntarily vocalize[d] obscenities in response to the cyclist's behavior and words." *Id.* ¶¶ 21-22. This interaction was recorded by an on-board camera mounted inside the NTA bus Cavienss was driving. *Id.* ¶ 23.

Cavienss did not report the incident, because he felt it was "normal engagement" with a "drunk" cyclist that had not ultimately caused any harm. *Id.* ¶ 22. But the cyclist complained to NTA about Cavienss's outburst, and Cavienss' supervisor reviewed tape of the incident. *Id.* His supervisor then shared the video more widely with Cavienss' coworkers and supervisors, which Cavienss believes was an effort to "mak[e] a decision in numbers to remove [him] from [NTA]." *Id.* ¶ 24. Cavienss was told he was "not fit to work for the company with that type of behavior." *Id.* He felt "deeply humiliated and ostracized." *Id.* ¶ 25.

Caviens' supervisor ultimately wrote a letter accusing Caviens of "violating [NTA's] disciplinary code by engaging in 'careless or reckless operation,' 'disobeying traffic regulations,' and 'discourteous[ness] or rudeness.'" *Id.* ¶ 26. On or around November 15, 2021, NTA suspended Caviens' employment and instructed him to appear at an investigatory meeting. *Id.* ¶ 27. On or around November 17, 2021, NTA held an employment status meeting during which it informed Caviens that he had been terminated and that his "verbal outburst had negatively reflected upon [NTA]." *Id.* ¶ 28.

Caviens' union, AFSCME, "aligned" with NTA and "refused to defend" Caviens. *Id.* ¶ 29. AFSCME also failed to give Caviens a "non-bias[ed]" union representative of his choice. *Id.* ¶ 30.

Caviens submitted a grievance regarding his termination. *Id.* ¶ 31. In support of his grievance, on November 24, 2021, Caviens' psychologist emailed NTA to explain that Caviens' "had long suffered from Tourette[] Syndrome, and that the syndrome could cause an individual to vocalize obscenities." *Id.* The psychologist wrote, "I am of the belief that [Caviens] responded to the confrontation in a manner consistent with his clinical limitations." *Id.* The psychologist also submitted a letter on November 29, 2021, which noted that the psychologist had a "long-standing history of treat[ing]" Caviens and "a detailed understanding of the Tourette [S]yndrome impairments which have been part of [Caviens'] childhood history dating back to elementary school." *Id.* ¶ 32. Regarding the November 15, 2021 incident, the psychologist wrote, "I suspect that this unanticipated response on [Caviens'] part was a rather involuntary response to an escalating anger-inducing incident with the bicyclist who was both disrespectful and exceptionally provocative verbally and via gestures. Throughout the period of my ongoing treatment of

[Cavienss], I have never witnessed his loss of control nor his blatant disregard for rules." *Id.* Cavienss' union representative "failed to review" the psychologist's letter. *Id.* ¶ 30.

Although NTA knew that Cavienss had Tourette Syndrome and that it "likely caused the behavior for which he was terminated," it decided not to reinstate him. *Id.* ¶¶ 33, 35. NTA told Cavienss they had never seen the letter from his psychologist.  *Id.* ¶ 35. It did not engage in an interactive process with Cavienss to identify a reasonable accommodation. *Id.* ¶ 36. His psychologist had suggested that NTA discipline Cavienss with a "'stern warning' about the effect of a second outburst . . . rather than termination," but NTA disregarded that recommendation. *Id.* ¶ 37. NTA did not consider "whether [Cavienss] could be reasonably accommodated with assignment to a bus route . . . involving fewer potential encounters with cyclists." *Id.* ¶ 38. Nor did it "explore whether [Cavienss] could have been reasonably accommodated with a brief period of leave to seek behavioral or therapeutic training that would give [him] skills for alternative responses to stimuli triggering his [Tourette Syndrome]." *Id.* ¶ 39; *see also id.* at 14-15 (certificates documenting that, in 2023, Cavienss successfully completed online courses on "understanding passengers who have experienced trauma" and "handling conflict and de-escalating skills for transit drivers and supervisors").

Since his termination, NTA has "widely shared" the video of the November 15, 2021 incident. *Id.* ¶ 40. As a result, Cavienss has been unable to find employment as a bus driver for any other municipal transit authority in Connecticut.  *Id.* Cavienss was living in a homeless shelter while working for NTA and has remained homeless. *Id.* ¶ 41.

### B.  Procedural History

On December 20, 2021, Cavienss filed a Complaint alleging that NTA violated his rights under the ADA. ECF No. 1.  Cavienss' first complaint, and a second amended complaint against

NTA and AFSCME, were each dismissed because Cavienss had not provided a "right to sue" letter from the EEOC. ECF Nos. 19, 23.

The EEOC issued a right to sue letter on December 9, 2022. ECF No. 40 at 14. Cavienss then filed two additional amended complaints, ECF Nos. 29, 34, both of which Magistrate Judge Spector recommended that the Court dismiss without prejudice, ECF Nos. 33, 39. Judge Spector's final recommended ruling concluded that Cavienss had not adequately established a prima facie case of disability discrimination because Cavienss failed to allege that (1) the defendants are subject to the ADA, (2) he is disabled under the ADA, (3) he was otherwise qualified to perform the essential functions of his job, (4) the defendants discriminated against him, and (5) he was denied a reasonable accommodation. ECF No. 39 at 16-23.

Cavienss then filed his Fifth Amended Complaint against NTA and AFSCME. ECF No. 40. I dismissed the ADA claims in that complaint without prejudice for failure to adequately allege that (1) the defendants are subject to the ADA, and (2) Cavienss was qualified to perform the essential functions of his job. ECF No. 107. With assistance from an attorney in the Federal Pro Se Legal Assistance Program at New Haven Legal Assistance Association, ECF No. 101 at 2, Cavienss has now filed a Sixth Amended Complaint, which the defendants have moved to dismiss, ECF Nos. 103, 105.

## III.    LEGAL STANDARD

To avoid dismissal under Fed. R. Civ. P. 12(b)(6), the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). I accept as true all of the complaint's factual

allegations when evaluating a motion to dismiss, *id.*, and must "draw all reasonable inferences in favor of the non-moving party," *Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.*, 517 F.3d 104, 115 (2d Cir. 2008).  However, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to survive a motion to dismiss. *Mastafa v. Chevron Corp.*, 770 F.3d 170, 177 (2d Cir. 2014) (citation omitted).  Although a *pro se* complaint must be liberally construed "to raise the strongest arguments it suggests," *pro se* litigants are nonetheless required to "state a plausible claim for relief." *Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013) (brackets, internal quotation marks, and citations omitted).  "[A] liberal interpretation of a *pro se* civil rights complaint may not supply essential elements of the claim that were not initially pled." *Darby v. Greenman*, 14 F.4th 124, 130 (2d Cir. 2021) (internal quotation marks omitted).

## IV.    DISCUSSION

### A.  NTA's Motion to Dismiss

#### (i)    *Disability Discrimination Claim*

The ADA prohibits an employer from discriminating against a qualified employee on the basis of disability. 42 U.S.C. § 12112(a).  A plaintiff claiming disability discrimination under the ADA must plausibly allege that: "(1) the employer is subject to the ADA; (2) the plaintiff is disabled within the meaning of the ADA or perceived to be so by [his] employer; (3) [he] was otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; (4) [he] suffered an adverse employment action; and (5) the adverse action was imposed because of [his] disability." *Davis v. N.Y.C. Dep't of Educ.*, 804 F.3d 231, 235 (2d Cir. 2015).  NTA argues that Cavienss has not adequately alleged the second and third elements, i.e.,

that he was disabled within the meaning of the ADA or perceived to be so, and that he was otherwise qualified for his position as a bus operator. ECF No. 105-1 at 7-13.

Disabled Under the ADA

The ADA defines "disability" as: "(A) a physical or mental impairment that substantially limits one or more major life activities . . . ; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1).

NTA contends that Cavienss has "failed to plead facts indicating that his alleged disability renders him unable to perform a major life activity or significantly restricts him in the ability to perform it." ECF No. 105-1 at 7. But NTA does not address whether Cavienss is "regarded as having" a disability under 42 U.S.C. § 12102(1)(C).

A person is "regarded as" disabled if he has "an actual or perceived physical or mental impairment *whether or not* the impairment limits or is perceived to limit a major life activity." *Id.* § 12102(3)(A) (emphasis added); *see also Jordan v. Forfeiture Support Assocs.*, 928 F. Supp. 2d 588, 605-06 (E.D.N.Y. 2013) (explaining that, until 2008, "a plaintiff who alleged [he] was 'regarded as' having a disability was required to show that the perceived disability was one that 'substantially limited a major life activity' . . . . [H]owever, the ADA Amendments Act of 2008  . . . set forth a new, more lenient, standard for determining whether an individual is 'regarded as disabled'" (footnote omitted)). "[A]n individual does *not* satisfy the requirement of 'being regarded as having such an impairment' if the impairment is 'transitory and minor.'" *Singleton v. United Parcel Serv., Inc.*, No. 3:13-CV-00409 (VLB), 2014 WL 943129, at *2 (D. Conn. Mar. 11, 2014) (quoting 42 U.S.C. § 12102(3)(B)).

Cavienss alleges that when he applied to work for NTA, he disclosed that he has Tourette Syndrome and severe dyslexia, and he explained that his Tourette Syndrome "cause[s] him to

sometimes involuntarily vocalize unwanted sounds or obscenities, especially in reaction to stressors." ECF No. 101 ¶ 9. These allegations are sufficient to support an inference that Norwalk Transit District perceived Cavienss as having a physical or mental impairment when it employed him.[1] Tourette syndrome is, at minimum, not "transitory." *See Singleton*, 2014 WL 943129, at *2 (noting that under the ADA's implementing regulations, a person is perceived as disabled unless the employer shows the perceived impairment "is both 'transitory' and 'minor'") (quoting 29 C.F.R. 1630.15(f)).

Because I find that Cavienss' allegations are enough to make him "regarded as disabled" under the 42 U.S.C. § 12102(1), he has adequately alleged that he was disabled within the meaning of the ADA. I need not consider NTA's argument that his Tourette Syndrome and dyslexia do not constitute "a physical or mental impairment that substantially limits one or more major life activities" under 42 U.S.C. § 12102(1)(A).

<u>Otherwise Qualified for his Position</u>

Next, NTA argues that Cavienss fails to plead that he was "otherwise qualified" for his position as a bus operator, because "he does not allege the essential functions or fundamental job duties of the bus driver position or that he was able to perform those functions." ECF No. 105-1 at 10. An employee is "otherwise qualified" for a position when he "is able to perform the essential functions of that job, either with or without a reasonable accommodation." *Shannon v. N.Y.C. Transit Auth.*, 332 F.3d 95, 99-100 (2d Cir. 2003). This burden is "not a heavy one," and requires only that the plaintiff "demonstrate that he possesses the basic skills necessary for performance of

---

[1] Cavienss also claims that his psychologist sent NTA a letter in support of his grievance, which informed NTA that Cavienss' "Tourette [S]yndrome impediments . . . have been part of [his] childhood history dating back to elementary school." ECF No. 101 ¶ 32. This letter is sufficient at least to support an allegation that Norwalk Transit District perceived Cavienss as having a physical or mental impairment when it decided not to reinstate him. *See Baker v. Connecticut*, No. 3:03-CV-01894 (JCH), 2006 WL 581205, at *9 (D. Conn. Mar. 8, 2006) ("Denial of reinstatement is also an adverse employment action.").

the job." *DeAngelo v. Yellowbook Inc.*, 105 F. Supp. 3d 166, 175 (D. Conn. 2015) (citations and internal quotation marks omitted).

Cavienss' Sixth Amended Complaint alleges that his "job duties included operating passenger buses on designated routes in the Greater Norwalk area." ECF No. 101 ¶ 12. He claims that he was qualified to complete these duties because he had a commercial driver's license and a certificate from Perimeter College in Atlanta indicating that he had completed a training on operating heavy-duty equipment, the dangers of the road, and professionalism. ECF No. 101 ¶ 13. Before joining NTA, he previously worked as a bus operator for two different organizations, *id.* ¶ 6, and was "celebrated by his bus customers, especially disabled customers, for his caring and professional manner," *id.* ¶ 7. From September 10, 2021 through November 15, 2021, Cavienss did not experience any driving incidents during his work for NTA.[2] *Id.* ¶ 14.

While I agree with NTA that Cavienss' complaint does not include detailed allegations about the "credentials, qualifications, and other requisite job-related requirements for his position," ECF No. 105-1 at 11, his allegations are nevertheless sufficient to support an inference that he was qualified to serve as a bus operator. Cavienss need only make a "minimal showing" that he "possesses the basic skills necessary for performance of [his] job." *Owens v. New York City Housing Auth.*, 934 F.2d 405, 409 (2d Cir. 1991) (citations and internal quotation marks omitted). "[W]here discharge is at issue and the employer has already hired the employee, the inference of minimal qualification is not difficult to draw." *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 92 (2d Cir. 2001). Here, NTA hired Cavienss—i.e., it viewed him as qualified for the job—

---

[2] In the same paragraph, Cavienss alleges: "And any heavy duty equipment with any company equipment in America has safety awards from prior employer's currently holds 0 point active points of career history in any vehicle [sic]." *Id.* ¶ 14. Another paragraph states that "[Cavienss] has a clean driving record No discipline from GA or Goodwill? What can be said to establish qualification for job highly .recommended [sic]." *Id.* ¶ 8. While these sentences are difficult to parse—and it appears the latter paragraph may reflect Cavienss' unfinished thoughts about what to include in his complaint—in light of the fact that Cavienss is *pro se*, I can reasonably infer that he intends to allege that he had a good safety record with his prior employers.

despite allegedly being informed that his Tourette Syndrome can cause him to involuntarily vocalize obscenities. ECF No. 101 ¶ 9.

Cavienss need not describe his job responsibilities in great detail—allegations about his past experience working for NTA or in similar positions can raise an inference that he was qualified to work as a bus operator. *See, e.g.*, *Gregory v. Daly*, 243 F.3d 687, 696 (2d Cir. 2001) (holding that allegations plaintiff had worked for employer for "ten years and had been promoted repeatedly" were sufficient to support inference of minimal qualifications, even though "the question of [the plaintiff's] qualifications for her job receive[d] little explicit attention in her pleadings"). Cavienss claims that he had worked as a bus operator before, had specialized training to prepare him for his primary responsibility (driving a bus), was "celebrated by his bus customers," and worked for NTA for several months without incident. ECF No. 101 ¶¶ 6-8, 11, 13-14. These allegations strengthen the inference—already raised by NTA's decision to hire him—that he had the minimal qualifications for his job.

In my prior ruling, I noted that Cavienss "own allegations raise questions as to [his] ability to perform essential functions of his job," because he admits that he sometimes involuntarily utters obscenities in response to stressful situations. ECF No. 92 at 12 (internal quotation marks, citations, and alterations omitted). But the Second Circuit has cautioned that "the qualification prong . . . cannot be transformed into a requirement that the plaintiff anticipate and disprove an employer's explanation that inadequate ability or performance justified the job action at issue." *Gregory*, 243 F.3d at 696; *see also Slattery*, 248 F.3d at 92 (reaching the same conclusion).

At the motion to dismiss stage, I cannot find that Cavienss lacked the minimal qualifications to serve as a bus driver simply because he acknowledges using profanity during one stressful interaction. While some courts in this circuit have held that "plaintiffs ceased to be

otherwise qualified for their positions when they engaged in misconduct that violated workplace policies," those cases have generally "involved situations where the plaintiff was violent, or where the policy violations often consisted of threats, sometimes of physical violence, against co-workers*." Moran v. Premier Educ. Grp., LP*, 599 F. Supp. 2d 263, 275-76 (D. Conn. 2009) (finding plaintiff had minimal qualifications for job despite misconduct); *see also Valentine v. Standard & Poor's*, 50 F. Supp. 2d 262, 288 (S.D.N.Y. 1999) (finding plaintiff unqualified where he left a "threatening" voicemail for his co-worker, after being previously warned about similar conduct), *aff'd*, 205 F.3d 1327 (2d Cir. 2000); *McElwee v. Cnty. of Orange*, 700 F.3d 635, 643 (2d Cir. 2012) (finding plaintiff unqualified for volunteer job where he had "longstanding course of inappropriate conduct with numerous female employees, nursing students, and visitors to the facility"); *Ray v. Kroger Co.*, 264 F. Supp. 2d 1221, 1227 (S.D. Ga.) (finding grocery store clerk unqualified where his Tourette Syndrome caused "daily outbursts of curse words and racial slurs"), *aff'd*, 90 F. App'x 384 (11th Cir. 2003).  Each of these cases involved conduct more evidently disqualifying than Cavienss' use of profanities on one occasion, and the courts also had the benefit of the full summary judgment record.[3]

From Cavienss' allegations, I can infer that he was qualified to operate a bus and that his outburst was not the type of severe or repeated policy violation that would render him manifestly unqualified to work for NTA. *See* ECF No. 101 ¶ 32 (alleging that Cavienss' psychologist had "never witnessed [Cavienss'] loss of control nor his blatant disregard for rules" after treating him for an extended period of time); *id.* ¶ 7 (alleging that Cavienss was "celebrated by his bus customers, especially disabled customers, for his caring and professional manner"). I therefore

---

[3] Of course, my ruling as to this issue does not preclude NTA from arguing at the summary judgment stage that Cavienss' outburst constitutes a legitimate and nondiscriminatory reason for discharge. "[U]nder the ADA, workplace misconduct is a legitimate and nondiscriminatory reason for terminating employment, even when such misconduct is related to a disability." *McElwee*, 700 F.3d at 641.

find that Cavienss has adequately alleged that he had the minimal qualifications to serve as an NTA bus operator.

Because NTA makes no argument that Cavienss has failed to allege the other elements of an ADA discrimination claim, I do not address those elements and deny the motion to dismiss as to the discrimination claim.

### (ii)    Reasonable Accommodation Claim

Cavienss also alleges that NTA violated the ADA by failing to accommodate his Tourette Syndrome. NTA contends that this claim should be dismissed because Cavienss does not allege (1) that he sought a reasonable accommodation from NTA, and (2) that he was capable of performing the essential functions of the job with a reasonable accommodation. I disagree.

"A plaintiff states a prima facie failure to accommodate claim by demonstrating that (1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations." *McMillan v. City of New York*, 711 F.3d 120, 125-26 (2d Cir. 2013) (internal quotation marks omitted).

"Generally, it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed." *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 135 (2d Cir. 2008) (internal citations, alterations, and quotation marks omitted). But where an employee's disability was "obvious," such that the employer "knew or reasonably should have known that the employee was disabled," the employer has an obligation to "engage in an interactive process with [that employee] . . . to assess whether [that] employee's disability can be reasonably accommodated." *Id.* (internal citations, alterations, and quotation marks omitted). "Nevertheless,

an employee may not recover based on his employer's failure to engage in an interactive process if he cannot show that a reasonable accommodation existed at the time of his dismissal." *McElwee*, 700 F.3d at 642.

Cavienss' allegations support an inference that NTA "knew or reasonably should have known" that he was disabled. As noted, he claims that he informed NTA of his Tourette Syndrome when he applied for the bus operator position. ECF No. 101 ¶ 9. He also alleges that NTA did not "engage in an [interactive] process with [him] for the purpose of seeking a reasonable accommodation." *Id.* ¶ 36; *see also id.* ¶ 58 ("[NTA] refused to engage [Cavienss] in a discussion about a reasonable accommodation and refused to make any such accommodation."). The question, then, is whether Cavienss has shown that a "reasonable accommodation existed at the time of his dismissal." *McElwee*, 700 F.3d at 642.

The Sixth Amended Complaint identifies three potential accommodations that NTA allegedly failed to consider: (1) giving Cavienss "a 'stern warning' about the effect of a second verbal outburst" instead of terminating him, (2) assigning Cavienss to "a bus route, based on location or time of day, involving fewer potential encounters with cyclists," or (3) allowing Cavienss "a brief period of leave to seek behavioral or therapeutic training that would give [him] skills for alternative responses to stimuli triggering his [Tourette Syndrome]." *Id.* ¶¶ 37-39.

NTA argues none of these proposed accommodations are reasonable. I agree with NTA as to the first two accommodations but disagree as to the third. The first accommodation—a "stern warning"—is not an accommodation at all, but rather a less severe form of punishment. *See McElwee*, 700 F.3d at 641 ("A requested accommodation that simply excuses past misconduct is unreasonable as a matter of law."). And Cavienss has not explained how a stern warning would accommodate his Tourette Syndrome, which allegedly "causes him to involuntarily vocalize

obscenities" in response to stressful situations. ECF No. 101 ¶ 17. As to Cavienss' proposal that NTA change his route, it is not plausible that a bus company could select a route that would allow Cavienss to avoid not only cyclists, but all other potential stressors. An employer "is not required to accommodate an employee's disability if the proposed accommodation is unreasonable or would impose an undue hardship on the employer." *Greenbaum v. New York City Transit Auth.*, No. 21-1777, 2022 WL 3347893, at *3 (2d Cir. Aug. 15, 2022).

Cavienss has adequately alleged, however, that NTA should have accommodated him with "a brief period of leave to seek behavioral or therapeutic training." *Id.* ¶ 39. District courts in this Circuit have concluded a temporary unpaid leave of absence can be a reasonable accommodation. *See, e.g.*, *Green v. Cellco P'ship*, 218 F. Supp. 3d 157, 164 (D. Conn. 2016); *Crawford v. Bronx Cmty. Coll.*, No. 22-CV-01062, 2023 WL 11862082, at *10 (S.D.N.Y. July 19, 2023) (collecting cases under New York employment statutes), *report and recommendation adopted*, 2024 WL 3898361 (Aug. 21, 2024). As NTA points out, the Second Circuit has "never resolved the question of whether paid or unpaid leave can constitute a reasonable accommodation under the ADA." *Petrone v. Hampton Bays Union Free Sch. Dist.*, 568 F. App'x 5, 7 n.2 (2d Cir. 2014). But the Circuit has suggested that a brief period of leave may be a reasonable accommodation, observing that other circuits "have concluded that a leave of absence may be a reasonable accommodation where it is finite and will be reasonably likely to enable the employee to return to work." *Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 186 n.6 (2d Cir. 2006) (finding district court had erroneously concluded employee's requested leave of absence was not finite). I follow most courts in this circuit and other circuits in finding that an unpaid leave of absence can constitute a reasonable accommodation, provided that it is of limited duration.

NTA argues that Cavienss has not adequately alleged that "the proposed leave would have

enabled [him] to successfully treat his symptoms so that he could perform the essential functions of his job without incident." ECF No. 105-1 at 21; *see Nandori v. City of Bridgeport*, No. 3:12-CV-00673 (JBA), 2014 WL 186430, at *6 (D. Conn. Jan. 16, 2014) ("Courts in this Circuit have held that where a plaintiff fails to establish that the requested leave would allow him to perform the essential functions of his job, such a request does not constitute a reasonable accommodation."). But Cavienss alleges that his involuntary vocalization of obscenities is triggered by stressful situations and feelings of extreme "anxiety," "fear," or "frustration." ECF No. 101 ¶¶ 10, 17. Construing his complaint "to raise the strongest arguments it suggests," *Walker*, 717 F.3d at 124, I can infer Cavienss could better manage his emotional response to stressful situations if given a "brief period of leave to seek behavioral or therapeutic training that would give [him] skills for alternative responses to stimuli triggering his . . . Tourette[] Syndrome," ECF No. 101 ¶ 38.

NTA also argues that Cavienss has not sufficiently alleged that the "brief period" of leave would be reasonable in this case, because he has not specified how much time he would need. At this stage of the litigation, however, it is sufficient for Cavienss to allege that NTA could have accommodated him with unpaid leave for "a definite period of time." *Robles v. Medisys Health Network, Inc.*, No. 19-CV-06651, 2020 WL 3403191, at *2, *10 (E.D.N.Y. June 19, 2020) (internal quotation marks omitted). And Cavienss was later able to complete a self-directed online course on handling conflict and de-escalation skills, ECF No. 101 at 15, which suggests that he might have been able to work with NTA to find behavioral training programs that would minimally disrupt his work schedule.

Because Cavienss has adequately alleged that NTA failed to initiate an interactive process to identify potential reasonable accommodations for Cavienss' Tourette Syndrome, and that a

reasonable accommodation existed that would have enabled him to avoid the November 15, 2021 incident, I deny NTA's motion to dismiss as to Cavienss' reasonable accommodation claim.

### (iii)    *Defamation Claim*

Cavienss' also asserts a defamation claim against NTA, based on (1) NTA's decision to share the video of the November 15, 2021 incident with NTA employees and others, and (2) the letter Cavienss received from his supervisor, which he claims falsely "accus[ed] [him] of violating [NTA's] disciplinary code by engaging in 'careless or reckless operation,' 'disobeying traffic regulations,' and 'discourteous[ness] or rudeness.'" ECF No. 101 ¶¶ 24, 26, 40.

As NTA points out, Cavienss' effort to add a defamation claim "goes beyond the scope" of this Court's order granting Cavienss leave to file his Sixth Amended Complaint. ECF No. 105 at 22. I permitted him to file an amended complaint only to repair the defects in certain claims he had raised in his Fifth Amended Complaint: his ADA, Fourteenth Amendment, and National Labor Relations Act claims. ECF No. 92 at 17. Cavienss did not seek leave to add a defamation claim before filing his Sixth Amended Complaint.

Even if I permit Cavienss to add a defamation claim, the allegations in his Sixth Amended Complaint are insufficient to establish that NTA defamed him. To raise a defamation claim under Connecticut law, a plaintiff must show: "(1) the defendant published a defamatory statement; (2) the defamatory statement identified the plaintiff to a third person; (3) the defamatory statement was published to a third person; and (4) the plaintiff's reputation suffered injury as a result of the statement." *Gambardella v. Apple Health Care, Inc.*, 291 Conn. 620, 627-28 (2009) (citations and internal quotation marks omitted). A "defamatory statement" is a "communication that tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Id.* at 627. "[F]or a claim of defamation to be

actionable," the defamatory statement must also be "false." *Cweklinsky v. Mobil Chem. Co.*, 267 Conn. 210, 228 (2004).

Regarding NTA's alleged decision to share the video of the November 15, 2021 incident, Cavienss has not alleged that the video constituted a false statement. Indeed, his allegations suggest that the video was an accurate representation of Cavienss' interaction with the cyclist. And as to his claim that his supervisor's letter falsely accused him of violating NTA's disciplinary code, Cavienss has not alleged that the letter was shared with anyone other than Cavienss. I therefore grant NTA's motion to dismiss as to Cavienss' defamation claim.

### B. AFCME's Motion to Dismiss

Cavienss' Sixth Amended Complaint also includes allegations regarding the conduct of his union, AFSCME. He claims that his union representative "co aligned with [NTA] and refused to defend" him and "failed to review [the psychologist's] letter." ECF No. 101 ¶¶ 29-30. He also alleges that AFSCME helped another employee—a former union President who worked in the engineering department—by filing a grievance following his termination. *Id.* ¶ 30. And he says that AFSCME did not give him a union representative of his choice from "a department that was [unbiased]" during an EEOC proceeding. *Id.* ¶¶ 30, 44. It is unclear what claims Cavienss intends to raise with these allegations. Because he is *pro se*, however, I will interpret his complaint to raise the most plausible claims against AFSCME that it suggests: a claim for breach of the duty of fair representation under the NLRA. or a claim for disability discrimination under the ADA.

Union members can bring an action for "breach of the union's duty of fair representation, which is implied under the scheme of the [NLRA]." *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 164 (1983). To prove that a union has breached this duty, the challenging member must: (1) "prove that the union's actions or inactions are either arbitrary, discriminatory, or in bad faith,"

and (2) "demonstrate a causal connection between the union's wrongful conduct and their injuries." *Vaughn v. Air Line Pilots Ass'n, Int'l*, 604 F.3d 703, 709 (2d Cir. 2010) (citations and internal quotation marks omitted). "A union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness' as to be irrational." *Air Line Pilots Ass'n v. O'Neill*, 499 U.S. 65, 67 (1991) (internal citation omitted). A union member's claim for breach of the duty of fair representation is "subject to a six-month statute of limitations," which "accrues no later than the time when [the plaintiff] knew or reasonably should have known that such a breach of the duty . . . had occurred . . . ." *Coureau v. Granfield*, 942 F. Supp. 2d 315, 320 (E.D.N.Y. 2013) (quoting *Cohen v. Flushing Hosp. & Med. Ctr.*, 68 F.3d 64, 67 (2d Cir. 1995)).

A union's breach of the duty of fair representation can also form the basis for an ADA claim, if the union intentionally "fails to assist in the processing of a grievance grounded in an employer's underlying discrimination." *Von Maack v. 1199SEIU United Healthcare Workers East*, No. 14-CV-04360, 2014 WL 5801349, at *5 (S.D.N.Y. Nov. 7, 2014). For such claims, "the [three-year] statute of limitations under the ADA—not the six-month statute of limitations for breach of [the] duty of fair representation—controls." *Smith v. Ford Motor Co.*, No. 07-CV-00422, 2009 WL 2448472, at *5 (W.D.N.Y. Aug. 7, 2009) (internal citations, quotations, and alterations omitted).

Cavienss has not adequately alleged that AFSCME's actions constituted a breach of the duty of fair representation, because his allegations do not support an inference that AFSCME's actions were "arbitrary, discriminatory, or in bad faith." *Vaughn*, 604 F.3d at 709. The Sixth Amended Complaint does not discuss AFSCME's motivations for failing to assist Cavienss. In one paragraph, Cavienss asserts that his union representative was biased but offers no factual

allegations to support this statement. ECF No. 101 ¶ 30. As Cavienss has not stated a claim for breach of the duty of fair representation, he cannot raise a claim for a violation of the ADA based on a breach of that duty. *See Henriquez-Ford v. Council of Sch. Sup'rs & Adm'rs*, No. 14-CV-02496 (JPO), 2015 WL 3867565, at *6 n.5 (S.D.N.Y. June 23, 2015) ("To establish an ADA claim against a union, a plaintiff must show . . . that the union breached its duty of fair representation . . . ."). I therefore grant AFSCME's motion to dismiss Cavienss' claims against it.

## V.   CONCLUSION

For the reasons explained above, I grant NTA's motion to dismiss Cavienss' defamation claim and deny NTA's motion to dismiss Cavienss' discriminatory discharge and failure to accommodate claims. I grant AFSCME's motion to dismiss all claims against it. The Clerk is directed to terminate AFSCME as a defendant.

In addition, Cavienss has filed three motions: a "Motion Under Rule 60(b) . . . For . . . Acceptance of Responsibility," a "Motion for Summary Judgment," and a Motion for Default Judgment. ECF Nos. 106, 116, 117. Those motions are denied. Cavienss is not entitled to relief under Rule 60(b) because no final judgment has been entered in this case. Cavienss' "Motion for Summary Judgment" does not argue that he is entitled to summary judgment under Rule 56, but instead requests that the Court appoint counsel and notes that he is open to alternative dispute resolution. ECF No. 116 at 1-2. The Second Circuit has cautioned district courts repeatedly against the routine appointment of counsel. *See, e.g.*, *Ferrelli v. River Manor Health Care Ctr.*, 323 F.3d 196, 204 (2d Cir. 2003); *Hendricks v. Coughlin*, 114 F.3d 390, 393 (2d Cir. 1997). The movant must satisfy "the threshold requirement that the [case] have 'some likelihood of merit.'" *Smith v. Fischer*, 803 F.3d 124, 127 (2d Cir. 2015) (internal citation omitted). Based on the current record, the Court cannot determine the likely merit of Cavienss' claims. Therefore, Cavienss' request to

appoint counsel is denied as premature, without prejudice to refiling. Regarding his statements about alternative dispute resolution, if the remaining parties (Cavienss and NTA) wish to be referred to a United States Magistrate Judge for a settlement conference or mediation, they should file a notice to the docket requesting a referral. Finally, Cavienss' motion for default judgment is denied, because (1) Cavienss did not request an entry of default from the Clerk, and (2) both defendants have appeared and defended themselves against Cavienss' claims.

IT IS SO ORDERED.

_____/s/_____

Michael P. Shea, U.S.D.J.

Dated:        Hartford, Connecticut

              September 16, 2024