## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| STANLEY CAVIENSS,<br><br>    *Plaintiff*,<br><br>    v.<br><br>NORWALK TRANSIT and<br>NORWALK TRANSIT DISTRICT,<br><br>    *Defendants*. | No. 3:21-cv-01694-MPS |

### RULING ON MOTION FOR SUMMARY JUDGMENT

Stanley Cavienss, *pro se*, brings this action against Defendants Norwalk Transit and Norwalk Transit District (collectively "NTD"), alleging violations of the Americans with Disabilities Act ("ADA"). The Defendants move for summary judgment on all claims remaining against them. For the reasons that follow, the motion for summary judgment is GRANTED.

This action stems from NTD's employment and subsequent termination of Cavienss as a bus driver. Cavienss alleges that during his employment with NTD, an altercation with a bicyclist triggered his Tourette Syndrome (which Cavienss refers to as "Nervous Tourette's Syndrome"), a condition that caused him to inadvertently vocalize unwanted sounds, including obscenities, toward the bicyclist. NTD terminated him as a result of this incident, and Cavienss brought claims against NTD for disability discrimination and failure to provide reasonable accommodations under the ADA, as well as for defamation. Sixth Amended Complaint, ECF No. 101 ("the Complaint"). He also brought claims against his union, AFSCME ("the Union"), *id.*, which I interpreted as a claim for breach of the duty of fair representation and a claim for disability discrimination under the ADA. *See* ECF No. 121 at 18. On September 16, 2024, I granted the Union's motion to dismiss all claims against it and also dismissed the defamation claim against NTD, leaving only the ADA

claims against NTD to proceed. *Id.* at 20. Due to the nature of the record before me on summary judgment, I will describe the relevant procedural history of this case before a full description of the facts underlying the claims.

## I.    PROCEDURAL HISTORY

On October 10, 2024, Cavienss filed a Motion to Reconsider the Court's ruling on the Motion to Dismiss, as well as "all rulings in favor of the defendants that have resulted in dismissals of claims or restrictions on my ability to gather and present necessary evidence." ECF No. 134 at 2. With this submission, Cavienss also notified the Court "that documentation relevant to this case ha[d] already been submitted to the Second Circuit in lieu of fair treatment by this Court." *Id.* at 3. I did not construe this statement as a motion for certification of an interlocutory appeal under 28 U.S.C.A. § 1292, and so I did not certify the interlocutory appeal.[1] On October 16, 2024, the Second Circuit docketed his appeal. No. 24-2717, Dkt. No. 3. On October 17, 2024, I denied the Motion for Reconsideration because it was untimely under Local Rule 7(c) and did not point to controlling decisions or information that the Court overlooked. ECF No. 138. On November 22, 2024, the Second Circuit Court of Appeals dismissed Cavienss's appeal for failure to pay the filing fee. ECF No. 149. A mandate issued on January 13, 2025. *Id.*

On October 15, 2024, with the Motion for Reconsideration and without waiting for the Second Circuit to rule on his uncertified interlocutory appeal, Cavienss filed a miscellaneous brief that, *inter alia*, described discovery issues, including the alleged failure of NTD to produce "the original voluntary disability form" on which he claims to have disclosed his disability to his employer. ECF No. 137. I construed Cavienss's brief as a Motion to Compel and issued an order

---

[1] The appeal consisted of the same document as the Motion for Reconsideration filed here. To the extent Cavienss sought certification of an appeal with this submission, that request is denied as moot because the appeals court dismissed the appeal for failure to pay the filing fee.

instructing NTD to produce the voluntary disability form. In subsequent correspondence with Cavienss, counsel for NTD indicated that it had not located any such form but had "otherwise produced to you the employment application information in my client's possession." ECF No. 140-1 at 2–3. On October 28, 2024, NTD filed a Motion for Protective Order in which it alleged that it could not locate the voluntary disability form, but that it understood "that the document, if it exists, may be in possession of a third party, Yale New Haven Health." ECF No. 140 at 1–2. NTD believed that a subsidiary of Yale New Haven Health had conducted a pre-employment physical examination of Cavienss and "may have retained the Plaintiff's pre-employment health file, which would likely include any voluntary disability form." *Id.* at 2. NTD also reported that Cavienss, despite his request to the Court for NTD to produce the form, refused to authorize NTD to request it from Yale New Haven Health, which is a covered entity subject to HIPAA regulations prohibiting most unauthorized disclosures of medical information. *Id.* To comply with the order to produce the form to Cavienss, NTD moved for a qualified protective order under 45 C.F.R. § 164.512(e)(1), which would allow it to issue a subpoena to Yale New Haven Health to obtain any pre-employment health file containing the voluntary disclosure form.[2] ECF No. 140 at 2–3. On October 30, 2024, I granted NTD's motion and issued a qualified protective order with the condition that "[t]he Defendant will not use or disclose the Plaintiff's protected health information for any purpose other than the instant litigation." ECF No. 141. On November 6, 2024, Cavienss objected to the Qualified Protective Order and also moved the court for a change of venue and to stay proceedings pending the appeal before the Second Circuit. ECF Nos. 142 at 2.

---

[2] 45 C.F.R. § 164.512(e)(1) permits covered entities to "disclose protected health information in the course of any judicial or administrative proceeding[] [i]n response to an order of a court . . . ." The provision further permits disclosure in response to a subpoena in the absence of a court order, so long as "[t]he party seeking the protected health information has requested a qualified protective order" from a court. *Id.* § 164.512(e)(1)(iv)(B).

On January 14, 2025, one day after the Court of Appeals issued its mandate dismissing Caviennss's uncertified appeal, NTD answered the operative complaint, ECF No. 145, and filed the present motion for summary judgment, ECF No. 146. As required by Connecticut Local Rule 56(b), NTD attached to the Motion for Summary Judgment a Notice to Self-Represented Litigant explaining the implications of the motion and providing instructions on responding, including how plaintiffs "must respond to specific facts the Defendants claim are undisputed (see Local Rule 56(a)(2)) and how [plaintiffs] must support [plaintiffs'] claims with specific references to evidence (see Local Rule 56(a)(3))." ECF No. 146-10. This submission also included copies of Rule 56 of both the Federal Rules of Civil Procedure, *id.* at 4–11, and this Court's Local Rules of Civil Procedure, *id.* at 12–16.

On February 3, 2025, Cavienss timely filed a six-page brief, nominally in opposition to NTD's Motion for Summary Judgment but which did not directly address any of the Motion's arguments. ECF No. 150. Moreover, Cavienss did not file a Statement of Facts in Opposition to Summary Judgment as required by Local Rule 56(a)2. On February 6, 2025, I issued an Order explaining that Cavieniss's opposition brief "did not adequately address the Defendants' arguments" and advised Cavienss to read the Notice to Pro Se Litigant. ECF No. 151. The Order provided Cavienss the opportunity to supplement his opposition within 21 days to address the Defendants' arguments in a supplemental brief and to include a Local Rule 56(a)2 Statement of Facts.[3] *Id.* The Order warned that if Cavienss "fails to file a supplement on or by **February 27, 2025**, or otherwise fails to comply with Rule 56, including the filing of a proper 56(a)2 Statement of Facts, the Plaintiff should understand that the Court may grant the Motion for Summary

---

[3] The Order also reproduced the relevant portions of the Connecticut Local Rules of Civil Procedure, Rule 56(a)2–3, which provides specific instructions on filing a Statement of Facts.

Judgment." *Id.*  The next day, February 7, 2025, Cavienss filed a supplemental brief that repeated many of the statements from the original opposition brief and again did not adequately address many of the arguments NTD raised in the motion to dismiss.  ECF No. 152.  Cavienss referred to my order of the day before by noting that "this brief includes the Local Rule 56(a)2 Statement of Facts in Opposition to Summary Judgment," but no such statement of facts was included.  *Id.* at 2.  NTD timely filed a reply to the original opposition brief and supplemental brief.  ECF No. 158.

## II.    RELEVANT RULES OF PROCEDURE

### A.  Local Rule of Civil Procedure 56

This Court's Local Rule of Civil Procedure 56(a)1 provides: "Each material fact set forth in the Local Rule 56(a)1 Statement and supported by the evidence will be deemed admitted (solely for purposes of the motion) unless such fact is controverted by the Local Rule 56(a)2 Statement required to be filed and served by the opposing party in accordance with this Local Rule, or the Court sustains an objection to the fact."  Cavienss has failed to file a Local Rule 56(a)2 Statement of Facts despite my order to do so (ECF No. 150) and in disregard of the instructions provided in the Notice to Pro Se Litigants (ECF No. 146-10).  Thus, the Defendants' alleged facts in their Local Rule 56(a)1 Statement of Facts are deemed admitted for purposes of this motion where they are supported by cited evidence.[4]  *Cruz v. Naqvi*, No.22-cv-347, 2024 WL 1330176, at *1 (D. Conn. Mar. 28, 2024) (citing *Small v. Clements*, No. 3:18-cv-01731, 2019 WL 5727388, at *1, n.1 (D. Conn. Nov. 5, 2019)).  "Self-represented litigants are not absolved of their obligation to file a Rule 56(a)2 statement."  *Cruz*, 2024 WL 1330176, at *1 (citing *Wu v. Nat'l Geospatial Intel. Agency*,

---

[4] To the extent Cavienss objects to any of these statements in his briefs (*see* ECF No. 152 at 2), the objections are not supported by evidence as required by Local Rule 56(a)3 ("Failure to provide specific citations to evidence in the record as required by this Local Rule may result in the Court deeming admitted certain facts that are supported by the evidence in accordance with Local Rule 56(a)1) . . . .").  Thus, I do not sustain any such objections.

No. 14-cv-01603, 2017 WL 923906, at *2 (D. Conn. Mar. 8, 2017)).  The facts below are taken

from NTD's Local Rule 56(a)1 Statement of Facts and exhibits and are deemed admitted and

undisputed unless otherwise stated.

### B. <u>Federal Rule of Civil Procedure 36</u>

In addition to failing to file a Local Rule 56(a)2 Statement, Cavienss did not directly

respond to NTD's Requests for Admission ("RFAs," ECF No. 146-7), instead informing defense

counsel that "I have no interest to sign any [discovery] document."  ECF No. 146-8 at 2; *see also*

ECF No. 146-2 ¶ 3 n.2.  Defense counsel warned Cavienss that the Court could deem the RFAs

admitted if he did not respond to them, ECF No. 146-8 at 2, but Cavienss did not respond or

otherwise object.  ECF No. 146-2 ¶ 3 n.2.  His summary judgment opposition briefs also do not

address the RFAs or other discovery requests from defense counsel.  *See* ECF Nos. 150, 152.  It

was only on March 14, 2025—three days *after* NTD filed its reply brief to its Motion for Summary

Judgment—that Cavienss submitted a "Request for Congressional Oversight Due to Judicial

Misconduct, Procedural Violations, and Constitutional Breaches," which contained a section

entitled "Response to Defendant's Requestions for Admission & Dual Interrogatories," in which

he addressed only three of the fifty-seven RFAs, and stated that "[a]ny and all questions in

Defendant's interrogatories are now irrelevant."  ECF No. 159 at 6–7. [5]

---

[5] The Court docketed this submission on March 17, 2025.  In this untimely document, Cavienss objected to RFA No. B.3 ("You did not state in the [employment] application that you had a disability."), denied RFA No. B.22 ("At one point, you stopped at a red light and, while stopped and after opening the bus doors, and after the bicyclist passed the bus, you yelled, 'You're a real piece of shit.'"), and admitted in part—without identifying if he denied any part—RFA No. B.47 ("Your Nervous Tourette's Syndrome causes you to involuntarily vocalize unwanted sounds or obscenities, especially in reaction to stressors.").  ECF No. 159 at 6–7; *see also* ECF No. 146-7 at 3, 7, 11.  No interrogatories are part of the summary judgment record before me.

Rule 36 of the Federal Rules of Civil Procedure states that "[a] party may serve on any other party a written request to admit, for purposes of the pending action only, the truth of any matters within the scope of Rule 26(b)(1) relating to . . . facts, the application of law to fact, or opinions about either; and . . . the genuineness of any described documents."  Fed. R. Civ. P. 36(a)(1).  "A matter is admitted unless, within 30 days after being served, the party to whom the request is directed serves on the requesting party a written answer or objection addressed to the matter and signed by the party or its attorney."  Fed. R. Civ. P. 36(a)(3).  Importantly, "Rule 36 admissions may be used for Rule 56 summary judgment."  *SEC v. Batterman*, No. 00-CV-4835, 2002 WL 31190171, at *5 (S.D.N.Y. Sept. 30, 2002).  Nevertheless, "only proper requests for admission will be deemed admitted."  *Coach, Inc. v. Horizon Trading USA Inc.*, 908 F. Supp. 2d 426, 432 (S.D.N.Y. 2012) (citing *Williams v. Krieger*, 61 F.R.D. 142, 144 (S.D.N.Y. 1973)) ("Rule 36, by its express terms, embraces only requests for admissions of fact or of the application of law to fact . . . [t]o force the defendant to 'admit' [legal conclusions] would only frustrate the purposes for which Rule 36 was drafted."); *see also Madej v. Yale Univ.*, No. 20-cv-133, 2020 WL 6270273, at *5 (D. Conn. Oct. 26, 2020) ("Rule 36 permits requests for admission addressed to law, but only as they relate to the application of law to fact.").

I find that each of the Defendants' RFAs is proper in that they each seek admissions of fact and do not otherwise ask Cavienss to admit legal conclusions.  *See* ECF No. 146-7.  I will not consider Cavienss' late responses to the three RFAs, which were submitted after the discovery period closed and summary judgment briefing was complete.  These responses, coupled with his initial refusal to defense counsel, demonstrate that Cavienss understood the potential effect of failing to respond to discovery requests but chose not to respond.  Accordingly, each of the

Defendants' RFAs are deemed admitted under Rule 36(a)(3) and I may consider them as evidence where they are cited in the Defendants' Rule 56(a)1 Statement and supported by evidence.

## III.     UNDISPUTED FACTS

### A.     Hiring and Employment

On or about June 29, 2021, Cavienss applied for a position as a bus driver with NTD.  ECF No. 146-2 ¶ 3.  The application made no mention of a disability or Tourette Syndrome.  *Id.* ¶ 4. On August 4, 2021, NTD offered Cavienss the position and stated that his employment would start on August 16, 2021.  *Id.* ¶ 5.  Cavienss's employment was subject to a six-month probationary period, *id.* ¶ 6, as well as a Collective Bargaining Agreement ("CBA") between NTD and the Union, *id.* ¶ 8.  Under the CBA, NTD could terminate the employment of a probationary employee covered by the CBA for any reason.  *Id.* ¶ 9.

The job description for Cavienss's position provided that drivers must have the "[a]bility to respond courteously under a wide set of conditions," *id.* ¶ 11, and that drivers "[m]ay be exposed to minor annoyances, *id.* ¶ 12.  On August 24, 2021, Cavienss signed the job description to acknowledge its receipt.  *Id.* ¶ 10.

### B.     Incident of November 15, 2021

In the morning of November 15, 2021, Cavienss was operating NTD Bus #238 in the course of his employment.  *Id.* ¶ 14.  During operation of the bus, Cavienss encountered a bicyclist, Ralph Vagnone, at whom Cavienss yelled obscenities and gestured with his hand.  *Id.* ¶¶ 15–16, 20. Footage of the incident was captured by NTD video cameras inside the bus.  *Id.* ¶ 15.  According to video footage of the incident, Cavienss also maneuvered the bus over the dotted white lines separating the left and right lanes of travel while accelerating past Vagnone.  *Id.* ¶ 17.  In

contravention of his job responsibilities, Cavienss did not report the incident to his supervisor, Derrick Clements. *Id.* ¶ 17.

Later that morning, NTD's Manager of Safety and Security for NTD, Andrew Gallagher, received a telephone complaint from Vagnone. *Id.* ¶ 20. Vagnone reported that the bus driven by Cavienss pulled away from the curb without signaling and nearly struck him, and then honked its horn at him. *Id.* Vagnone also reported that Cavienss opened the bus door and yelled obscenities at him. *Id.* After speaking to Vagnone, Gallagher informed the NTD's Transportation Manager, La-Keba Hamilton, and downloaded the video footage from the bus's onboard cameras during the time of the incident.

Later in the day, Hamilton and Gallagher met with Cavienss and discussed the incident. *Id.* ¶ 22. Hamilton reviewed the video with Cavienss, who blamed Vagnone for the incident and said the bicyclist had yelled profanities and made an obscene gesture toward him. *Id.* ¶ 23. During the meeting, Cavienss did not say that he had Tourette Syndrome or a disability. *Id.* ¶ 24.

**C. <u>Termination</u>**

Later on November 15, 2021, Cavienss received a letter from his supervisor, Clements, notifying him that NTD had determined he had committed three violations of the NTD's Disciplinary Code: (1) through careless or reckless operation of the bus; (2) by disobeying traffic regulations; and (3) by acting discourteously and rudely. *Id.* ¶ 25. The letter also instructed Cavienss that he could defend himself, with the assistance of union representation if desired, at a "Loudermill" hearing, after which NTD would determine potential discipline, including the possibility of termination. *Id.* ¶ 26.

On November 17, 2021, Cavienss appeared at the Loudermill hearing with union representation. *Id.* ¶ 27. As he had in his earlier meeting with Hamilton and Gallagher, Cavienss

again faulted the bicyclist, *id.* ¶ 28, and did not mention he had Tourette Syndrome or request accommodations, *id.* ¶29.  Later that day, NTD terminated Cavienss's employment because of his "unsafe and unprofessional" conduct in the incident with the bicyclist.  *Id.* ¶ 30.  A letter notifying Cavienss of his termination, dated November 17, 2021 and marked "Hand Delivered," noted that the termination was effective the same day.[6]  ECF No. 146-3 at 84; ECF No. 146-7 ¶ 38.

### D. <u>Post-termination</u>

Until this point, Cavienss had not informed NTD or any NTD employee that he had Tourette Syndrome or any other disability.  ECF No. 146-2 ¶ 35.  The day after his termination, November 18, 2021, Cavienss sent text messages to a member of NTD's Human Resources department, Jennifer Flores.  *Id.* ¶ 33.  In one of these messages, Cavienss wrote: "Listen Jennifer I should told [you] before I don't know if this help me but if let the [CEO] know I have disability I have nervous Tourette's and that biker made me nervous."  *Id.*  On November 22, 2021, Cavienss sent another text message to Flores, which said: "I know Derek [sic] [Clements] and Andy [Gallagher] did me wrong but they don't know about my Tourette's I hardly give this info out." *Id.* ¶ 34.  On November 30, 2021, Flores and Clements received an email from Richard Kessler, a purported treatment provider for Cavienss, who wrote in an attached letter dated November 19, 2021, that he had a "detailed understanding" of Cavienss's "Tourette [S]yndrome impediments."

---

[6] At times during this litigation, Cavienss has suggested he was suspended for three days on November 17, rather than terminated.  *See, e.g.*, ECF No. 137 at 2.  This suggestion appears to stem from the NTD's "Bus Operator and Shop Employee Disciplinary Code," which notes that "[c]areless or reckless operation" carries a "3 day suspension" for a first offense.  ECF No. 146-3 at 77.  Cavienss, however does not dispute the date that he was terminated in his summary judgment opposition briefs, and he did not object to the Rule 56 statement that as a probationary employee he could be terminated for any reason, or to the statement that he was terminated on November 17.  ECF No. 146-2 ¶¶ 9, 30.

*Id.* ¶ 36.[7]  Neither Kessler nor Cavienss provided medical records corroborating that Cavienss had been diagnosed with Tourette Syndrome.  *Id.* ¶ 38.

On November 21, 2021, the Union submitted a grievance to NTD regarding Cavienss's termination.  *Id.* ¶ 40.  On December 1, 2021, Cavienss attended a grievance meeting with Flores, Hamilton, and a Union vice president, Allan Blade.  *Id.* ¶ 41.  At the meeting, Cavienss again faulted the bicyclist but also disclosed that his conduct was attributable to a condition that he referred to as "laughing Tourette's."  *Id.* ¶ 42.  Cavienss also acknowledged at the meeting that he had not previously disclosed this condition to NTD.  *Id.* ¶ 43.  Cavienss did not propose any accommodations for his disability during the grievance meeting.  *Id.* ¶ 45.  NTD denied the grievance after the meeting because Cavienss had not previously disclosed a disability, his conduct during the bicyclist incident was unsafe and unprofessional, he failed to report the incident, and he was a probationary employee subject to termination for any reason under the CBA.  *Id.* ¶ 44.

## IV.    **LEGAL STANDARD**

"Summary judgment is appropriate only if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014) (internal quotation marks and citations omitted).  In reviewing the summary judgment record, a court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant."  *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013).  "A genuine dispute of material fact exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that

---

[7] Kessler's letter indicates that he had a "previous communication, dated 11/24/2021," with NTD. There is no evidence of other communication with Kessler in the record before me.

party's favor." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013). The moving

party bears the burden of demonstrating that no genuine issue exists as to any material fact. *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). If the moving party carries its burden, "the

opposing party must come forward with specific evidence demonstrating the existence of a genuine

dispute of material fact. More specifically, it must do more than simply show that there is some

metaphysical doubt as to the material facts,and may not rely on conclusory allegations or

unsubstantiated speculation." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011).

Moreover, the opposing party "cannot defeat the motion by relying on the allegations in his

pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion

are not credible" but must "present admissible evidence in support of [his] allegations; allegations

alone, without evidence to back them up, are not sufficient." *Welch-Rubin v. Sandals Corp.*, No.

03cv481, 2004 WL 2472280, at *1 (D. Conn. Oct. 20, 2004). "Where no rational finder of fact

could find in favor of the nonmoving party because the evidence to support its case is so slight,

summary judgment must be granted." *Brown*, 654 F.3d at 358 (internal quotation marks omitted).

## V.    **DISCUSSION**

The ADA prohibits an employer from discriminating against a qualified employee on the

basis of disability. 42 U.S.C. § 12112(a). Cavienss brings claims under the ADA for disability

discrimination and failure to provide reasonable accommodations.

"Claims alleging disability discrimination in violation of the ADA are subject to the

burden-shifting analysis originally established by the Supreme Court in *McDonnell Douglas Corp.*

*v. Green*, 411 U.S. 792 [] (1973)." *McBride v. BIC Consumer Prod. Mfg. Co.*, 583 F.3d 92, 96 (2d

Cir. 2009). "A plaintiff must establish a prima facie case; the employer must offer through the

introduction of admissible evidence a legitimate non-discriminatory reason for the discharge; and

the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext." *Id.*

In order to establish a *prima facie* case of discrimination based on adverse employment action, a plaintiff must show by a preponderance of the evidence that: (1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered an adverse employment action because of his disability. *Woolf v. Strada*, 949 F.3d 89, 93 (2d Cir. 2020). "Similarly, to establish a *prima facie* case for failure to provide a reasonable accommodation, a plaintiff also must satisfy the first three factors, but for the fourth factor, he must show by a preponderance of the evidence that his employer refused to make a reasonable accommodation." *Id.* "The plaintiff's burden of proof as to this first step has been characterized as minimal and *de minimis.*" *Zann Kwan*, 737 F.3d at 844 (internal quotations marks and citation omitted). "However, it is not non-existent and [s]ummary judgment must be granted whenever the undisputed facts, viewed most favorably to the non-moving plaintiff, do not make a prima facie case." *Robles v. Cox & Co.*, 987 F. Supp. 2d 199, 206 (E.D.N.Y. 2013).

## A.  ADA Claims

For the reasons explained below, I find that Cavienss has failed to meet his *prima facie* burden to establish by a preponderance of the evidence that he was disabled within the meaning of the ADA or that NTD perceived him to be so.  The ADA defines "disability" as: "(A) a physical or mental impairment that substantially limits one or more major life activities . . . ; (B) a record of such an impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(1). Cavienss provides no evidence that he meets any of these standards.

### 1. Substantially limited major life activity

Major life activities include "caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 45 C.F.R. § 84.3(j)(2)(ii). "To determine whether a major life activity is substantially limited by an impairment, we consider, among other factors, 'the nature and severity of the impairment; its duration or expected duration; and the existence of any actual or expected permanent or long term impact.'" *Ibela v. Allied Universal*, No. 21-1995-CV, 2022 WL 1418886, at *1 (2d Cir. May 5, 2022). "The term 'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA. 'Substantially limits' is not meant to be a demanding standard." 29 C.F.R. § 1630.2(j)(1)(i).

The Second Circuit has recognized that the ability to interact with others is a major life activity under the ADA, but "[t]he standard is not satisfied by a plaintiff whose basic ability to communicate with others is not substantially limited but whose communication is inappropriate, ineffective, or unsuccessful." *Jacques v. DiMarzio, Inc.*, 386 F.3d 192, 202–03 (2d Cir. 2004).

Cavienss presents no evidence that Tourette Syndrome substantially limits his ability to interact with others or any other major life activity. According to the letter from Kessler, "Tourette syndrome impediments" had "been part of [Cavienss's] childhood history dating back to elementary school." ECF No. 146-5 at 27. Although Kessler provided three pages of an overview of the range and severity of symptoms of Tourette Syndrome,[8] *id.* at 29–31, the letter did not

---

[8] Although the Mayo Clinic's general overview of "Tourette syndrome," which Kessler submitted to NTD, notes that "[s]evere symptoms might significantly interfere with communication, daily functioning and quality of life," it also says that "[m]any people with Tourette syndrome don't need treatment when symptoms aren't troublesome," and that "the spectrum of tics that people experience is diverse." ECF No. 146-5 at 29-31. To the extent I may consider this document for its truth, *see* Fed. R. Evid. 801 and 802, I conclude from these general descriptions that the disorder can vary in severity and does not always substantially limit major life activities. *Compare McBride*

indicate which symptoms Cavienss had ever exhibited or to what extent the condition affected him, aside from a vague reference to "longstanding emotional limitations," *id.* at 28.  Moreover, far from indicating that Tourette Syndrome substantially limited Cavienss, Kessler notes that he "ha[s] never witnessed [Cavienss's] loss of control nor his blatant disregard for rules" as a result of the condition.

Moreover, Cavienss does not contend that Tourette Syndrome substantially limits his interactions with others.  Nowhere in his opposition briefs does he discuss any substantial limitations or the severity of his symptoms.  *See* ECF Nos. 150, 152.  Further, in a post-termination text message to Flores, he indicated that he does not regularly disclose that he has Nervous Tourette Syndrome, ECF No. 146-7, suggesting that his symptoms are not, at least, immediately obvious in everyday interactions with others.  Indeed, Cavienss operated the bus and interacted with passengers on a daily basis for three months without incident before November 15, 2021.  And in the operative complaint, Cavienss alleged that he was "celebrated by his bus customers, especially disabled customers, for his caring and professional manner."  ECF No. 101 ¶ 7.

The only evidence pertaining to the severity of Cavienss's symptoms comes from the Rule 56 Statement of Facts, in which the parties agree that Cavienss's "Nervous Tourette's Syndrome causes him to involuntarily vocalize unwanted sounds or obscenities, especially in reaction to stressors," ECF No. 146-2 ¶ 48, and that he "cannot predict or control when he might involuntarily vocalize unwanted sounds or obscenities in response to stressors encountered in the performance of everyday tasks, including in the performance of job duties and responsibilities," *id.* ¶ 51.

---

*v. Amer Tech., Inc.*, No. 12-CV-00489, 2013 WL 2541595, at *1, *5 (W.D. Tex. June 10, 2013) (holding that "minor" Tourette syndrome tics did not substantially limit major life activities) *with Ray v. Kroger Co.*, 264 F. Supp. 2d 1221, 1226 (S.D. Ga. 2003) (holding that Tourette syndrome substantially limited communication where plaintiff had "uncontrollable daily outbursts of vocal tics, including profanity, vulgar words and racial slurs").

Without more, such as an indication of frequency and severity, the fact that Cavienss's Tourette Syndrome at times causes him to "involuntarily vocalize unwanted sounds or obscenities" does not meet the standard for substantial limitation of a major life activity. *See Jacques*, 386 F.3d at 202 (plaintiff does not satisfy standard of substantial limitation in interacting with others where his communication is merely "inappropriate, ineffective, or unsuccessful"); *Pineda v. ESPN, Inc.*, No. 18-cv-325, 2018 WL 5268123, at *3 (D. Conn. Oct. 23, 2018) (plaintiff did not allege a qualifying disability without "provid[ing] any factual support detailing the frequency, duration, or severity of any limitations on a life activity caused by her PTSD" (internal quotation marks omitted)).

### 2. Record of impairment

Cavienss cannot show that he had a record of an impairment that substantially limited a major life activity. The EEOC defines "record of impairment" as "a history of . . . a mental or physical impairment that substantially limits one or more major life activities." 29 C.F.R. § 1630.2(k)(1). As noted, the only evidence that Cavienss has or had Tourette Syndrome—aside from his own unsupported assertions—is the email and accompanying letter from his treatment provider, Kessler. ECF No. 146-5 at 26–31. Although Cavienss contends in his opposition brief that Kessler "conducted a psychological evaluation" of him, ECF No. 150 at 2, this claim is unsupported by Kessler's communications. Kessler wrote that he had engaged in "ongoing clinical treatment" of Cavieness, and that he had "a long-standing history of treatment provided to Mr. Cavienss including a detailed understanding of the Tourette syndrome impediments which have been part of his childhood history dating back to elementary school." ECF No. 146-5 at 28–29. This letter does not, however, say that Kessler specifically evaluated or treated Cavienss for

Tourette Syndrome, and there is no evidence that he was qualified to do so.[9]  Nor does Cavienss provide any medical records indicating the severity of his condition.  *Id.* ¶ 38.  Without any indication of the severity of symptoms that Cavienss experienced in the past, he has not demonstrated that he has a record of an impairment that substantially limits a major life activity.

### 3.  Regarded as having such an impairment

A person is "regarded as" disabled if he has "an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity."  42 U.S.C. § 12102(3)(A).  The evidentiary record contains no indication that NTD regarded Cavienss as having a physical or mental impairment.  Indeed, nothing in the record indicates that NTD was aware that Cavienss had Tourette Syndrome until the days following his termination.  As noted, Cavienss interacted with passengers on a daily basis without reports of any triggering incidents for the duration of his employment before November 15, 2024.  ECF No. 146-2 ¶¶ 13, 18.

In his supplementary opposition brief, Cavienss argues that he "completed a 'Voluntary Self-Identification of Disability' (Form CC-305) which clearly disclosed his disability status in accordance with ADA and EEOC guidelines."[10]  ECF No. 152 at 3.  He has not, however, produced

---

[9] Apart from the fact that his letter is hearsay, I note that it appears as though, at the time he wrote the letter, Kessler was not a medical doctor, but rather a Licensed Mental Health Counselor and Certified Alcoholism and Substance Abuse Counselor Trainee.  *See* 146-5 at 28 (signing letter as "M.A., Ph.D. (Cand.), LM.H.C., CASAC/T").  It is possible that these credentials do suggest that Kessler is qualified to offer opinions of the sort offered in his letter, see Fed. R. Evid. 701–05, but there is not enough evidence in the record from which I could find even that there is a genuine dispute of material fact on this point.

[10] Cavienss argues that Form CC-305 "is a federal requirement for government contractors, used to ensure compliance with disability rights laws."  ECF No. 152 at 3.  He appears to be referring to a federal regulation that states that a "contractor shall invite applicants to inform the contractor whether the applicant believes that he or she is an individual with a disability . . . .  This invitation shall be provided to each applicant when the applicant applies or is considered for employment. The invitation may be included with the application materials for a position, but must be separate from the application."  41 C.F.R. 60-741.42; *see King v. Lutheran Child & Fam. Servs. of Illinois*, No. 18 C 309, 2020 WL 5439981, at *3, *6 (N.D. Ill. Sept. 10, 2020) (CC-305 is "a form created

17

any document to substantiate his claims that he filled out such a form, or a similar form, or that he otherwise "disclosed on his application that he has a diagnosed mental impairment, Nervous Tourette's Syndrome [and] severe dyslexia."[11]  ECF No. 101 ¶ 9.  Cavienss acknowledges that this form is a "crucial document proving Plaintiff's disability was voluntarily disclosed at the time of hire," but he argues that "Defendants failed to provide this form as evidence."  ECF No. 152 at 4; *see also id.* at 12 ("This document was never submitted to the court, which constitutes evidence withholding.").  The parties already raised a dispute regarding the existence of such a form during discovery.  Recognizing that production of a "voluntary disability form" would likely be critical to Cavienss's claims, I ordered NTD to "produce the requested materials or file a statement showing cause why they should not be produced."  ECF No. 139.  In response, NTD filed a statement in which it reported that it did not have any such form in its possession but suspected "that the document, if it exists, may be in possession of a third party, Yale New Haven Health," as part of a pre-employment health file.  ECF No. 140 at 1–2.  Cavienss, however, would not authorize NTD to obtain any material from Yale New Haven Health.  *See* ECF No. 140-1.  Again, because of the likely importance of such a document to Cavienss's claims, I issued a qualified protective order authorizing NTD to acquire any such form from Yale New Haven Health for use solely in this litigation.[12]  ECF No. 141.  In its reply brief, NTD indicated that "Yale New Haven Health

---

by the Department of Labor for federal contractors and subcontractors" to maintain for their employees).  There is no evidence in the record that NTD is a federal contractor or subcontractor, and thus no indication it would have required Cavienss to fill out this specific form.  Cavienss also argues that the form is "federal mandated" for "companies that receive federal funding."  ECF No. 152 at 3.  Even if I were to accept this statement as true, Cavienss supplies no evidence that NTD receives federal funding.

[11] Although Cavienss mentions in the Complaint that he has "severe dyslexia" that requires accommodations, ECF No. 101 ¶¶ 4, 9, he does not allege in the complaint that NTD discriminated against him because of dyslexia or denied him accommodations for dyslexia.

[12] Apparently misunderstanding my purpose, Cavienss has subsequently objected to the qualified protective order.  ECF Nos. 142 at 2, 150 at 2, 152 at 4.  I issued the order because Cavienss alleged

produced to NTD what it had in terms of a pre-employment health file, which NTD in turn produced to Cavienss." ECF No. 158 at 3 n.3. Neither party provided any of this material to the Court as part of the summary judgment record.[13] The absence of evidence from the record does not create a question of material fact because, without the form (as Cavienss describes it), there is no evidence that NTD knew he had Tourette Syndrome before it terminated his employment. *See Bassi v. New York Med. Coll.*, No. 19 CIV. 7542, 2023 WL 2330478, at *13 (S.D.N.Y. Mar. 2, 2023) ("Barring evidence that Defendants improperly withheld their meeting records, the non-existence of such records does not create a genuine dispute of material fact."), *aff'd*, No. 23-278, 2024 WL 3717317 (2d Cir. Aug. 8, 2024); *Pacenza v. IBM Corp.*, 363 F. App'x 128, 130–31 (2d Cir. 2010) ("Because [p]laintiff did not adduce evidence that his supervisor had knowledge of his disability, he failed to make a prima facie showing of discrimination under the ADA."). Meanwhile, Cavienss admits that he acknowledged at his post-termination grievance hearing that

---

that NTD was withholding a voluntary disclosure form. ECF No. 137 at 2–4. The purpose of the qualified protective order was to ensure NTD left no stone unturned and fully complied with my order to search for and produce any voluntary disclosure form *to Cavienss for his benefit*. *See* ECF No. 139. Cavienss also misunderstands that HIPAA regulations permit disclosures of protected health information without his direct authorization in certain situations. Relevant here, "[a] covered entity may disclose protected health information in the course of any judicial or administrative proceeding . . . [i]n response to a subpoena, discovery request, or other lawful process, that is not accompanied by an order of a court or administrative tribunal, if . . . [t]he covered entity receives satisfactory assurance . . . from the party seeking the information that reasonable efforts have been made by such party to secure a qualified protective order." 45 C.F.R. § 164.512(e)(1)(ii)(B); *see* ECF Nos. 140, 141. Cavienss's objections to the qualified protective order and NTD's compliance with its discovery obligations are overruled.

[13] To the extent Cavienss argues that records obtained from Yale New Haven Health without his authorization have prejudiced him, *see, e.g.*, ECF No. 152 at 3, there can be no prejudice because neither party has submitted any evidence obtained from Yale New Haven Health. Without any such material before me, I do not credit NTD's statement in its reply brief that evidence obtained from Yale New Haven Health "did not contain any Voluntary Self-Identification of Disability form nor was there any indication in the file that Cavienss disclosed that he had Tourette's Syndrome." ECF No. 158 at 7. But I also do not credit Cavienss's unsupported claims that a voluntary disclosure form exists.

he had not previously disclosed his Tourette Syndrome to NTD.   ECF Nos. 146-2 at ¶ 43; 146-4

at 13–14.  Thus, there is no dispute of material fact—NTD did not regard Cavienss as having an

impairment.

In sum, Cavienss has not proffered evidence to meet his minimal burden at the first step of

the *McDonnell Douglas* to establish a *prima facie* case of discrimination or failure to provide

accommodations.  No evidence supports his claims that he was disabled within the meaning of the

ADA or that NTD perceived him to be so.  He has failed to argue otherwise in his opposition briefs

or produce supporting evidence.  As discussed, Kessler's letter (to the extent it constitutes

admissible evidence) did not mention the severity of Cavienss's condition or show that he was

substantially limited in a major life activity, and there is no evidence that NTD has failed to comply

with its discovery obligations.  Cavienss has thus failed to raise a dispute of material fact that he

was disabled as defined by the ADA.

### 4.  Pretext

Even if Cavienss had established a *prima facie* case, he does not contest that NTD has met

its burden of production at the second step of the *McDonnel Douglas* framework by proffering

legitimate non-discriminatory reasons for terminating him and declining to reinstate him after his

grievance hearing: Cavienss's conduct with the bicyclist was "unsafe and unprofessional, [] he

failed to report the incident[,] and . . . NTD could terminate a probationary employee for any

reason. ECF No. 146-2 ¶ 44.  And by failing to provide any evidence, he fails to satisfy his burden

of persuasion at the third step of the *McDonnel Douglas* framework that these proffered non-

discriminatory reasons are pretext for discrimination or denial of reasonable accommodations.

*Welch-Rubin*, 2004 WL 2472280 at *1 (parties opposing summary judgment must "present

admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient").  Therefore, his claims fail as a matter of law.

### B.  **Miscellaneous Arguments**

The majority of Cavienss's opposition briefs consist of grievances regarding past procedural issues and claims that the Court and the Defendants denied him due process for various reasons.  I have reviewed these other arguments and find them to be without merit.

Specifically, Cavienss argues that I denied him due process by not immediately ruling on his request to stay the case pending the resolution of his uncertified interlocutory appeal.  *See* ECF Nos. 142 at 2, 150 at 4.  This argument is baseless.  The federal statute governing interlocutory appeals provides that "application for an appeal hereunder shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order." 28 U.S.C. § 1292(b).  No such order issued here.  In any event, no stay was warranted because Cavienss did not demonstrate any of the factors that courts consider when deciding whether to issue a stay pending appeal: "(1) 'whether the movant has shown a substantial possibility, although less than a likelihood, of success on appeal,' (2) 'whether the movant will suffer irreparable injury absent a stay,' (3) 'whether the opposing party will suffer substantial injury if a stay is granted,' and (4) 'the public interests that may be affected.'" *United States Sec. & Exch. Comm'n v. Ahmed*, No. 15-cv-675, 2020 WL 1502278, at *2 n.1 (D. Conn. Mar. 30, 2020) (quoting *Cooper v. Town of E. Hampton*, 83 F.3d 31, 36 (2d Cir. 1996)).  As such, even if the Second Circuit had not dismissed the appeal, I would not have granted a stay.  Claims of obstruction by the Defendants are without merit because the Union is no longer a party to this case, and the appeal was dismissed before NTD filed its motion for summary judgment.

Cavienss also argues that I have shown bias to him by dismissing the Union as a defendant in the Motion to Dismiss, among other adverse rulings. *See id.* at 4–5, ECF No. 152 at 5, 8–9. The Second Circuit has repeatedly held that adverse rulings cannot constitute a claim of judicial bias. *See, e.g.*, *Doe v. E. Lyme Bd. of Educ.*, 962 F.3d 649, 666 n.27 (2d Cir. 2020); *Sheafen Kuo v. Gov't of Taiwan*, 802 F. App'x 594 (2d Cir. 2020).

Cavienss also alleges that NTD, the Union, and the Court are colluding against him, ECF No. 150 at 4, that evidence submitted by NTD has "not been duly examined in accordance with legal standards," *id.*, and that video of the bicycle incident has been altered, ECF No. 152 at 18–19. These arguments are conclusory and unsupported by evidence. Cavienss also admitted to the authenticity of the video when he failed to respond to NTD's discovery requests. ECF No. 146-7 ¶ A-4. His request for sanctions for evidence tampering, ECF No. 152 at 18–19, is thus denied.

Finally, Cavienss claims that NTD failed to comply with various federal regulations, including failing to "administer a mandatory drug and alcohol test" after the bicyclist incident, as well as withholding distribution of COVID-19 relief funds. ECF No. 152 at 13–19. These allegations are irrelevant to whether he is disabled under the ADA. Further, without admissible evidence, they do not support an argument that NTD's reasons for terminating him are pretext.

## VI.    <u>CONCLUSION</u>

With this ruling, I am not discounting any challenges Cavienss may encounter as a result of his Tourette Syndrome and the fact that he was terminated from his position at NTD. I find only that despite ample opportunity, Cavienss has not presented evidence sufficient for a jury to find that his Tourette Syndrome renders him disabled under the ADA's legal standard. For these reasons, the Defendants' motion for summary judgment is GRANTED. The Clerk is instructed to close the case.

IT IS SO ORDERED.

_____/s/_____

Michael P. Shea, U.S.D.J.

Dated: Hartford, Connecticut

May 15, 2025